## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

# 08-14165



ALAN RICHARDS and
GTL TECHNOLOGIES, INC.

    **Plaintiffs,**

vs.

AYUSMAN SEN, PENNSYLVANIA
STATE UNIVERSITY, PENN
STATE RESEARCH FOUNDATION,
and McQUAIDE BLASKO FLEMING
& FAULKNER, INC.

    **Defendants.**

_____/

FILED by ____ D.C.

MAY - 9 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## COMPLAINT

    Plaintiffs Alan K. Richards and GTL Technologies, Inc., file this Complaint against Defendants Ayusman Sen, Pennsylvania State University, and Penn State Research Foundation, and state:

## I. JURISDICTION AND VENUE

    1. Subject matter jurisdiction for this suit exists under each and all of the following:

    (i) the patent laws of the United States, 35 U.S.C. 101 et seq. (also see 28 U.S.C. 1338);

    (ii) the Uniform Declaratory Judgment Act, 28 U.S.C. 2201 and 2202;

    (iii) the federal law prohibiting unfair competition (Lanham Act, Section 43), 15 U.S.C. 1125; and,

    (iv) the federal antitrust statutes, including the Clayton act, in 15 U.S.C. 15.

**SCANNED**

2. Personal jurisdiction exists under Florida's Long Arm Statute, Florida Statutes '48.193, which applies to tortious acts committed within the State of Florida.

3. Alan K. Richards (hereafter referred to as Richards) resides and has his principle place of business in Martin County, Florida, in the Southern District of Florida.  Venue is proper in the Southern District of Florida under 28 U.S.C. 1391(b).

## II.  PARTIES

4. Plaintiff Richards is a chemist, and is the inventor and owner of various U.S. and foreign patents and patent applications that describe and claim a process he discovered and conceived, for converting methane gas into stable liquids that can be transported by tanker or pipeline.

5. Plaintiff GTL Technologies, Inc. (hereafter GTL) is a Delaware corporation with its principal place of business in Martin County, Florida. It is and at all times has been solely owned by Richards. It has authority to act as an agent in behalf of Richards, including authority to enter into and enforce contracts. However, GTL is not an owner or co-owner of any patent rights, and has never had any ownership interest in any patents or patent applications which are the subject of this lawsuit.

6. Defendant Ayusman Sen (hereafter Sen) is, and at all relevant times has been, a chemistry professor employed by Pennsylvania State University, located in State College, Pennsylvania. In all actions described herein, Sen acted with both actual and apparent authority as an agent for both Pennsylvania State University and the Penn State Research Foundation. Sen's actions described herein were done with the knowledge of, and for the benefit of, that University, and for the Penn State Research Foundation.

7. Defendant Pennsylvania State University (hereafter also referred to as Penn State University, or simply Penn State) is located in State College, Pennsylvania. It is a not-for-profit educational institution, organized and operating in the Commonwealth of Pennsylvania.

8. Defendant The Penn State Research Foundation (hereafter also referred to as the Research Foundation) is a subsidiary, affiliate and/or agent of Penn State University. The Research Foundation owns, manages, and licenses patents for and in behalf of Penn State University and its professors and researchers. The Research Foundation maintains its principal offices on the campus of Penn State University.

9. Defendant McQuaide, Blasko, Fleming & Faulkner, Inc. (hereafter referred to as McQuaide Blasko et al) is a law firm that works for and is an agent for Defendants Penn State University and Penn State Research Foundation, and for professors at Penn State. It is the law firm which filed and prosecuted the fraudulent patent applications that falsely claimed that Ayusman Sen and Sen's research assistant were the inventors of a chemical process which in fac they learned about from Plaintiff Richards, the true inventor. Attorneys at Defendant McQuaide Blasko et al played active and essential roles in various breach of contract and tortious acts by the other Defendants, and also encouraged and participated in criminal actions leading to this dispute, including perjury, fraud, theft, and criminal conspiracy.

## III. COMMON ALLEGATIONS OF FACT

10. In February 2003, Plaintiff Richards conceived of a new chemical process for converting methane gas into liquids that can be transported across oceans or continents by tanker or pipeline. Richards sought patent protection, and was granted U.S. Patent No. 7,282,603 (hereafter referred to as the Richards '603 Patent, Plaintiff's Exhibit 1).

11. Briefly, the chemical process discovered by Richards involves:

(i) breaking apart a very strong peroxide compound, to release two "radicals", with each radical having an unstable and highly reactive unpaired electron;

3

(ii) using the radicals to remove hydrogen from methane in a way that creates methyl radicals;

(iii) enabling the methyl radicals to undergo a chain reaction with sulfur trioxide, in a manner that forms a compound called methane-sulfonic acid (abbreviated MSA).

This process can be called a "radical-initiated chain reaction". When the peroxide is broken apart to start the reaction, each radical that is released will trigger a chain reaction that causes thousands of molecules of methane gas to bond to sulfur trioxide, in a precise and consistent manner that rapidly creates almost completely pure MSA.

12. The MSA compound, which is a liquid, can be removed from the first reactor, and sent to a "downstream" reactor. In the "downstream" processing, the sulfur group is removed from the MSA and recycled back into the system. This completely avoids and eliminates a major waste problem. The methyl portions of the treated MSA molecules are converted into stable liquids (such as methanol, also called methyl alcohol) that can be transported efficiently to distant markets, such as by tanker or pipeline.

13. Because of complex reasons, rapid and efficient conversion of methane gas into stable liquids was never previously possible. As a result, more than $100 million worth of methane gas is being burned, destroyed, and wasted every day, in useless flares at thousands of "remote" oil fields and facilities around the world. The process discovered by Plaintiff Richards can put an end to that wasteful and destructive process, and can eliminate hundreds of millions of tons of greenhouse gas emissions every year.

14. The chemistry involved in this dispute is complex, and the energy, environmental, and commercial impacts (and profit potential) of this new invention have shaped and driven the positions and actions of the parties. Because those factors cannot be adequately explained in a "notice pleading" but are nevertheless very important in this dispute, they are addressed and explained in more detail in Plaintiff's Exhibits 2 and 3. Exhibit 2 describes the chemistry, and the machinery that will be used to perform the reaction. Exhibit 3 describes how and why "waste

4

methane" at "remote" oil fields is being flared in huge quantities (worth over $100 million, every single day) around the world, how this new chemical process can eliminate that problem, and the impacts this technology can have, in helping reduce greenhouse gas releases and global warming. An affidavit from Plaintiff Richards is enclosed, stating that he has read all Exhibits, and to the best of his knowledge and belief, all Exhibits are true and accurate.

15. After conceiving the invention, Richards obtained the paid assistance of a computer modeling specialist to create a computer simulation (or model) of the chemical process, using very sophisticated software and a very powerful computer at a university (which was not Penn State University). As one of the essential steps for creating that computer simulation, Richards had to specify, in exact detail, every reagent that would be present at the start of the reaction. The results of the computer simulation showed that the reaction would occur at temperatures lower than the boiling point of water. The computer simulation also showed that the reaction would be both efficient and selective, with high yields of the desired MSA product, and only small quantities of any unwanted byproducts. The results and predictions of that sophisticated computer simulation were later confirmed to be entirely accurate and reliable.

16. Since the computer simulation required that all starting reagents and conditions had to be specified in complete detail, and since the computer simulation accurately and reliably predicted how the reaction would proceed and what the products would be, Richards had fully "conceived" of the invention, as that term is used and interpreted under the U.S. patent law, by the time the computer simulation was completed and its results had been analyzed and interpreted. All insights and research that were necessary to:

(i) specify all reagents, solvents, initiator compounds, and suitable reaction conditions for the chemical reaction;

(ii) know and understand what the product of the reaction would be; and,

(ii) fully recognize and understand the significance of the computer simulation results, and of the practical, industrial, and commercial importance of the reaction,

were fully completed and accomplished by Plaintiff Richards, with no assistance of any sort from

5

Defendant Sen, before Richards disclosed any information about the process to Defendant Sen or any other Defendant.

17. After the computer simulation work had been entirely completed, Plaintiff Richards disclosed the chemical reaction system, and the computer modeling results, to Defendant Sen. This disclosure of information was directly covered by a confidentiality and non-use agreement that was signed by Sen on June 5, 2003 (hereafter referred to as the Confidentiality Agreement, enclosed as Plaintiff's Exhibit 4).

18. When Sen executed the Confidentiality Agreement, he was acting in his capacity as an employee and agent for Defendant Penn State University.

19. Sen's goal and purpose, in signing that agreement, was to obtain confidential information (including the computer simulation results) from Richards and GTL, in order to make an informed decision on whether he (Sen) and his employer (Penn State) should and would agree to carry out a set of laboratory tests, in chemistry labs in the Chemistry Department of Penn State University.

20. In June 2003, under the terms and protections of the signed Confidentiality Agreement, Richards provided to Sen a set of password-protected files containing a written report and a drawing that had been created by Richards with no input of any sort from Sen. The Richards drawing, and the relevant portions of the Richards report, are enclosed as Plaintiff's Exhibits 5 and 6.

21. The drawing and report in Exhibits 5 and 6 were written by a chemist for other chemists, and there are various phrases, symbols, and other information that will not be readily apparent to people who are not chemists. Therefore, Plaintiff's Exhibit 7 is an analysis that describes and explains, in detail, how and why the Richards report and drawing disclosed, to Defendant Sen, each and all of the following elements of the methane conversion system:

(i) methane gas and liquid $SO_3$, from separate sources, are pumped into a reactor;

6

(ii) the reactor is loaded with an initial quantity of MSA, which will act as a solvent that helps promotes the gas/liquid reaction;

(iii) a compound called Marshall's acid (a strong peroxide) is activated by energy input, causing its peroxide bond to break, thereby releasing two sulfuric acid radicals;

(iv) the sulfuric acid radicals from "activated" Marshall's acid are pumped into the reactor vessel that holds the methane gas, the liquid $SO_3$, and the MSA solvent;

(v) each sulfuric acid radical will initiate a chain reaction that causes methane molecules to bond to sulfur trioxide molecules, in a precise and specific manner that creates essentially pure MSA, which emerges from the reactor as a liquid;

(vi) the liquid MSA that has been removed from the reactor is sent to a "downstream" reactor, which removes sulfur dioxide ($SO_2$) from the MSA;

(vii) the $SO_2$ is oxidized to convert it back into sulfur trioxide ($SO_3$), which is recycled directly back into the reactor that creates MSA;

(viii) when the sulfur portion is removed from the MSA, the methyl portion of the MSA is converted into a stable liquid (such as methanol, also called methyl alcohol), which can then be transported via tanker or pipeline.

22. The documents in Exhibits 4-6 show and prove that Plaintiff Richards conceived of, and then disclosed to Defendant Sen under a signed Confidentiality Agreement, each and all of the following aspects of the chemical reaction for converting methane into MSA:

(i) the combination of reagents and solvent that should be mixed together to carry out the reaction;

(ii) what the product of the reaction would be;

(iii) the use of MSA as a solvent for carrying out the radical-initiated chain reaction;

(iv) the use of Marshall's acid as a peroxide initiator compound that will trigger the chain reaction that causes methane gas to bond to $SO_3$ in a manner that creates almost completely pure MSA; and,

(v) computer modeling results which showed (accurately) that the reaction would proceed efficiently at a temperature below the boiling point of water.

7

23. Plaintiff's Exhibit 7 also describes a scientific article coauthored by Defendant Sen in 1996, cited herein as "Basickes, Hogan & Sen 1996" (Plaintiff's Exhibit 8). That 1996 article by Defendant Sen describes prior efforts by Sen and his research assistants to convert methane into MSA, using various salts to initiate the reaction, and using sulfuric acid as the solvent. Those reactions were slow and inefficient; however, the equipment and the methods that were used, in those 1996 tests, were exactly the same types of equipment and methods that were used by Sen seven years later, in 2003, to test the new reaction that had been discovered by Richards and disclosed to Sen by Richards. Richards chose Sen to do the first confirmatory work, because Richards knew that Sen had already done similar tests years earlier, using exactly the same types of equipment to handle methane/liquid mixtures under high pressure.

24. The identification of methods and equipment for testing the Richards process, in 2003, did not require any unusual level of insight or creativity by Sen, once the new combination of reagents and solvent was disclosed to Sen by Richards. Sen simply performed the same types of tests he had already described in Basickes, Hogan & Sen 1996, published seven years earlier, using a new set of reagents that had been fully identified and specified by Richards rather than Sen.

25. Sen received and understood the information provided to him by Richards in June 2003. After reviewing that information, Sen agreed to participate in laboratory research to test the process. This is confirmed by an email that Sen wrote and sent to Richards on June 16, 2003 (Plaintiff's Exhibit 9). As shown in Exhibit 9, the header of Sen's e-mail referred to the new process as, *"Richards system"*. The text of Sen's cover letter said:

"I finally had time to think about *your very interesting system* . . . I look forward to the opportunity to test out some [of] *your ideas*." (emphasis added)

In addition, the title of Sen's analysis (a file that was attached to Sen's cover letter, included in Exhibit 9) was, "Thoughts and Comments on *The Richards System*". These statements and

admissions were made by Sen, in writing, before Sen later filed a patent application which falsely claimed that Sen was the one who discovered what he himself had called *The Richards System*.

26. After Sen agreed to participate in the laboratory tests, he and Richards notified Sen's employer, Penn State University, of Sen's desire to test the reaction that had been disclosed to him by Richards. Both Richards and Sen cooperated with Penn State to create a research funding contract.

27. In July 2003, a research funding contract was created and signed between Plaintiff GTL Technologies Inc, and Penn State University. This "small business technology transfer" contract (hereafter referred to as the "STTR Contract") is attached as Plaintiff's Exhibit 10. Among other things, the STTR Contract anticipated and provided that:

       (i) funds to support the research in Sen's labs at Penn State would initially be paid by GTL Technologies, to Penn State University;

       (ii) after certain milestones had been achieved and reported to the federal Department of Energy (DOE), GTL Technologies would be reimbursed for the funds it had paid to Penn State, via a DOE grant award.

28. The STTR contract (Exhibit 10) did not contradict, supersede, or invalidate the Confidentiality Agreement Sen had signed the previous month (Exhibit 4). The STTR contract and the Confidentiality Agreement were consistent and compatible with each other, and the signed Confidentiality Agreement continued to apply to Sen. In March 2004, Sen stated in writing to Richards that he (Sen) regarded himself as still being bound by the Confidentiality Agreement.

29. In reliance on both the Confidentiality Agreement and the STTR Contract, GTL Technologies paid $48,000.00 to Penn State, for chemical research that would be performed in chemistry labs supervised by Sen, at Penn State University.

30. The initial set of tests in Sen's labs at Penn State used a small closed "batch reactor"

(i.e., a specialized beaker designed to withstand high pressures). The results from those "batch tests" confirmed the results that Richards' computer simulation had accurately predicted.

31. Pursuant to the terms of the STTR Contract, Richards then asked Sen to test the reaction in a "continuous flow" system. Sen refused to do so, and instead demanded 10% ownership of Richards' company, as the price for his further cooperation.

32. Richards refused to transfer to Sen a 10% ownership stake in GTL Technologies, as demanded by Sen.

33. Beginning in or about March 2004, Defendants refused to cooperate with Richards and GTL Technologies, even though Defendant Penn State was still being paid for diligent performance under the STTR Contract.

34. In direct violation of the STTR Contract, Defendants concealed from Richards and from GTL Technologies the fact that Defendants were secretly preparing and filing a patent application that was directly adverse to Richards' patent rights.

35. With active support, encouragement and cooperation from Penn State University, Sen and at least one attorney working at the Defendant McQuaide Blasko et al law firm prepared and filed U.S. provisional patent application 60/563,717, filed on April 20, 2004. The first two pages of Defendants' provisional application 60/563,717, which contain a number of "admissions against interest" by Defendants, are enclosed as Plaintiff's Exhibit 11. That provisional application by Defendants falsely and fraudulently asserted that: (i) Sen and his research assistant, Minren Lin, were the only two inventors of the chemical process; and therefore, (ii) Plaintiff Richards did not qualify as even a coinventor, even though Richards had actually discovered the process and had disclosed it to Sen and Lin only under signed confidentiality and non-use contracts.

36. Beginning in about March 2004, Defendants made it impossible for GTL

Technologies to satisfy certain reporting and other requirements of GTL's grant agreement with the DOE. Therefore, in August 2004, GTL Technologies was forced to notify the DOE that it had to cancel and terminate the grant agreement.

37. The DOE agreed to terminate and "close out" the GTL grant award. No money was ever received from the federal government by Plaintiffs or by any person, company, or other entity associated with Plaintiffs. Termination of the grant award forced Plaintiffs to forfeit and lose a payment of more than $99,000.00 from the DOE, under a signed contract that had been fully approved and issued by the DOE in August 2003.

38. Plaintiffs notified Defendants in August 2004 that Plaintiffs were terminating the STTR Contract. Plaintiffs had fully complied with the terms and requirements of that Contract, until the notice of termination was sent to Defendants.

39. On April 13, 2005, Defendants filed a U.S. utility patent application, serial number 11/105,245, which issued as US patent 7,119,226 (the Sen '226 patent). The Sen '226 patent was assigned to, and is owned by, Defendant Penn State Research Foundation. That patent issued on October 10, 2006, which is less than two years prior to the filing of this lawsuit.

40. Defendants obtained the Sen '226 patent by means of fraudulent, inequitable, and unlawful acts, which included but were not limited to the following:

(i) use of a defective and misleading "inventor's declaration" which violated the requirements of the federal patent law as codified in 35 U.S.C. §§ 115 and 116;

(ii) deliberate concealment, from the patent examiner, of a crucial item of published prior art that was well-known to Defendants, which was a published patent application by Plaintiff Richards that described and claimed the exact same chemical process that Defendant Sen falsely tried to claim as his own discovery; and,

(iii) deliberate concealment, from the patent examiner, of crucially important facts pertaining to inventorship, as described and admitted in Sen's emails to Plaintiff Richards and on pages 1 and 2 of Sen's provisional patent application 60/563,717 (Exhibit 11).

11

41. On or about April 16, 2005, after the Defendants' utility patent application had already been filed, Sen's research assistant (Minren Lin) provided to Plaintiff Richards a copy of what appeared to be the text of a provisional patent application, designating "A. Sen, et al." as inventors. No additional information concerning that provisional application was provided to Richards by Minren Lin; instead, Lin indicated to Richards that he (Lin) did not know what was happening, but that he (Lin) had been directly instructed and effectively ordered by his direct supervisor, Defendant Sen, to sign some type of patent form, earlier that week.

42. After seeing what appeared to be the text of a provisional application by Sen, but with no supporting or explanatory information, Plaintiffs repeatedly requested information and/or documents from Defendants, pertaining to any patent applications that might have been filed by Defendants relating to the methane conversion process. Despite those repeated requests, Defendants refused to ever provide any such information or documents to Plaintiffs.

43. The first factual information which revealed that Defendants had indeed filed a patent application, falsely and fraudulently claiming the chemical process which Plaintiffs had discovered and disclosed to Defendants, did not become available to Plaintiffs until after May 11, 2006, the date on which the U.S. Patent Office posted the text of Sen's application on its official website. No notification of that publication was ever provided to Plaintiffs by Defendants; instead, Plaintiffs located that application only by searching the Patent Office's public database every few weeks.

44. When it was issued in October 2006, the Sen '226 Patent was published on the Internet, and therefore was available for reading and review throughout the State of Florida, and among any and all oil, gas, or chemical companies that otherwise might have been interested in licensing the Richards '603 patent.

45. Defendant Sen and Defendant Penn State Research Foundation knew of the false assertions put forth in the Sen '226 patent application. Such knowledge existed when the utility

12

application was first filed at the Patent Office in April 2005, and it continued throughout the entire period while the application was pending, until it was issued in October 2006.

46. Defendant Penn State University had constructive, implied, imputed, and similar knowledge of the falsity of various assertions in the Sen '226 patent application, and of direct and deliberate violations of the STTR agreement to which Penn State was a signing party, due to the actions and the knowledge of its authorized employee-agents. In addition, in September 2007, the President, and the Senior Vice-President for Research, at Penn State University, were both given direct and explicit notification (by Plaintiff's attorney) of the false, fraudulent, and illegal conduct of Defendant Sen and Defendant Penn State Research Foundation, Both of those high-level officials at Penn State declined, failed, and refused to correct those problems, which continue to this day as ongoing illegal acts. Accordingly, Defendant Penn State University is fully aware of and liable for the actions of its agents.

47. Defendants affirmatively violated the non-disclosure and non-use provisions of the Confidentiality Agreement and the STTR Contract, with deliberate intent to conceal their actions and efforts from Plaintiffs, in order to secure a patent which fraudulently excluded Plaintiff Richards as inventor, and which concealed crucial prior art from the patent examiner.

48. Defendants concealed the Sen '226 patent application from Plaintiffs, in violation of both the Confidentiality Agreement and the STTR contract, in order to prevent Plaintiffs from asserting their valid and lawful rights under those two contracts and under the patent laws of the U.S. In addition, the assignment and transfer of the Sen '226 patent rights, from Sen to the Penn State Research Foundation, was concealed from Plaintiffs, in deliberate violation of the Confidentiality Agreement and the STTR Contract.

49. After the Sen patent application had been allowed by a patent examiner (based on inequitable conduct and deliberate concealment of crucial facts, by Defendants), Defendants had to pay a printing fee, to have the patent issued. Defendants paid that fee in June 2006, with the knowledge and intent that payment of the fee would lead to publication of an issued patent,

which occurred in October 2006. When Defendants paid the issue fee in June 2006, they knew and intended that the Sen '226 patent would be published, and they knew that such publication would disparage, defame, and devalue Richards' patent application and any patent that issued therefrom.

50. The Defendants' publication of the Sen '226 patent was (and continues to be) a disparaging and defamatory act against Richards personally, and against the Richards '603 patent.

51. As acts of libel and defamation against Richards personally, Defendants issued a published statement, endorsed by a large and well-funded university with a worldwide reputation, which effectively stated that Richards is dishonest, untrustworthy, and unreliable, and is a liar and a thief, because Richards is trying to steal an invention which Penn State and an entire team of attorneys have asserted to be an invention that was truly conceived and created at Penn State, rather than by Richards.

52. Under Florida law, the actions by Defendants also constitute "slander of title" (also referred to by terms such as commercial disparagement, injurious falsehood, etc.) against the Richards '603 patent, which is an item of property that is properly and lawfully located in Florida. That patent has been severely damaged by the defamatory actions of Defendants.

53. The continuing and ongoing publication of the Sen '226 patent, without retraction by Defendants despite a reexamination request and litigation by Plaintiffs, continues to this day, and constitutes active and ongoing libel, defamation, and slander of title. The actions by Defendants have severely damaged the value of the Richards '603 patent, and have inflicted financial and other damage on the Plaintiffs.

54. Beginning in late 2003, as soon as the results of the Sen "batch reactor" tests became available, Plaintiff Richards began informing a number of oil, gas, and chemical companies about the new methane conversion process. After preliminary exchanges of information, Plaintiff

Richards entered into a first "option contract" with a major international petrochemical company in March 2004, to enable that company to learn more about the conversion process, so that it could begin evaluating costs, equipment requirements, and economic and commercial prospects. A second similar option contract was subsequently created with a second major petrochemical company.

55. In late 2003 and early 2004, before the rupture of their relationship, Richards advised Sen that he (Richards) had created an option agreement with a major petrochemical company, and was actively seeking other option or licensing agreements with other companies. Richards provided that information to Sen in confidence, in reliance on both the Confidentiality Agreement and the STTR Contract.

56. As a result of Richard's confidential disclosures to Sen, Sen knew about Richards' licensing efforts and activities in early 2004, when Sen demanded 10% ownership of Richards' company as the price of his future support. Accordingly, Sen knew about Richards' licensing activities when Defendants filed a false and fraudulent patent application, and when Defendants paid the issue fee that caused the Sen '226 patent to be published as an issued patent. Accordingly, Sen and the other Defendants acted with knowledge and intent that their falsehoods would interfere with Plaintiffs' ongoing and prospective business relationships with oil, gas, and chemical companies.

57. When Plaintiff's option agreements with two major petrochemical companies expired, both companies declined to pursue or license the technology or patent rights. Both companies directly indicated to Plaintiffs that their refusal to go forward, despite the promise and potential of the chemical reaction itself, was due primarily to the uncertainties and obstacles that clouded and damaged the patent estate, as created by Defendants. In addition, all current and continuing licensing discussions that Plaintiffs are currently seeking or conducting, with other petrochemical companies, are being severely entangled and damaged by the ongoing fraudulent and illegal actions of Defendants. Plaintiffs' ability to commercialize and market the Richards '603 patent has been severely damaged by the continuing publication of the fraudulent and

defamatory Sen '226 patent.

58. Defendants' publication of the Sen '226 patent, with its written assertions that Richards is not the true inventor of the chemical process, was made willfully and maliciously, in order to gain economic advantage for Defendants, to the detriment of the Plaintiffs.

59. By lawful and proper means (and with explicit acknowledgement of Sen's confirmatory tests, in the text of the patent), Plaintiff Richards obtained US patent number 7,282,603, issued in October 2007.

60. Defendants (acting through their attorneys) have demanded, in writing and on more than one occasion, that Ayusman Sen be added as a coinventor of the Richards '603 patent. One example of that demand, in a letter dated August 19, 2005 from attorney Mark Righter of the Defendant McQuaide Blasko law firm, is enclosed as Plaintiff's Exhibit 12.

61. In response to Defendants' request, Plaintiffs' patent attorney has repeatedly requested Defendants to provide with any documents or other evidence that might shed light on Defendants' assertion that Defendant Sen and/or his research assistant Minren Lin, should be designated as a coinventor of the Richards '603 patent.

62. Despite repeated requests from Plaintiffs, Defendants have refused to provide, to Plaintiffs or Plaintiffs' patent attorney, any documents or other evidence concerning possible coinventorship of the Richards '603 patent. Those refusals have rendered it impossible for Plaintiff's patent attorney to reach a properly informed final decision on whether the Richards '603 patent should be corrected, to add one or more additional coinventors.

63. During Plaintiffs' attempt to license the Richards '603 patent to oil or gas companies, the potential licensee companies inquire into whether Plaintiff is aware of any known, prospective, or potential "clouds" or challenges to the validity of the Richards '603 patent. That is a normal and proper act of "due diligence", and Plaintiffs are obliged to answer such questions

honestly. Plaintiffs have therefore been obliged to disclose, to prospective licensees, that Penn State University has challenged the inventorship of the Richards '603 patent and has demanded that Ayusman Sen must be added as a coinventor of that patent. This has created a major obstacle, impediment, and hindrance to licensing the Richards '603 patent. Therefore, the coinventorship demands, by Defendants, continue to financially damage the Plaintiffs, and have damaged the economic value of the Richards '603 patent.

64. The written coinventorship demand by Defendants, when combined with Defendants' refusal to provide any evidence to explain or support their demand, is part of Defendants' malicious efforts to make it difficult or impossible for Plaintiffs to license Plaintiffs' patent rights unless Plaintiff first obtains Defendants' approval. Such actions by Defendants are intended to coerce Plaintiffs into giving and surrendering valuable rights and income to Defendants, even though Defendants have not earned and do not deserve any such rights or income, and have tried instead to improperly steal such rights and income by means of fraud, theft, unlawful conversion, and other malicious, injurious, unlawful, and even criminal acts.

65. In March 2008, in response to a request by Plaintiff Richards, the US Patent Office declared that it will reexamine the Sen '226 patent. That action will consider the published Richards prior art, which Defendants failed and refused to disclose to the patent examiner even though Plaintiffs explicitly requested and demanded such disclosure. so. The official notice of the reexamination proceeding is provided as Plaintiff's Exhibit 13.

66. In that notice of reexamination, the Patent Office stated that it was aware of the Plaintiffs' allegations of fraud concerning inventorship of the Sen '226 patent. However, the Patent Office declared that it will limit any reexamination solely to the issue of newly-cited prior art, and it will *not* consider or attempt to resolve the issue of Defendants' fraudulent inventorship claims.

67. In addition to the foregoing, Defendants have made untrue, unjustified, and defamatory statements concerning Plaintiffs, which pertain to Plaintiff's relationships with the

federal Department of Energy, including statements that are available in publicly-accessible records, which falsely and unfairly accuse Plaintiffs of violating various laws, rules, and requirements pertaining to Plaintiff GTL Technologies' grant contract with the DOE.

## COUNT I
## DECLARATORY JUDGMENT RE: SEN '226 PATENT

68. Paragraphs 1 - 67 are realleged and incorporated herein by reference.

69. Defendants have violated the following requirements of United States patent law:

(i) the requirement to identify the true inventor(s) of an invention;

(ii) the requirement to use language required by the federal patent law, in the forms that were signed by the Defendants' purported inventors; and

(iii) the requirement to disclose relevant prior art to the patent examiner.

70. Since the Patent Office has declared that it will decline and refuse to inquire into the issue of fraud, concerning the claims of inventorship of the Sen '226 patent, this Court is requested to issue a declaratory judgment, stating that the Sen '226 Patent is the product of fraud, theft, and other illegal and inequitable conduct. Such declaratory judgment should be issued, regardless of whether the Sen '226 is declared invalid due to published prior art, because the issues of fraud versus prior art are separate and distinct issues, and because a judicial determination that Defendants committed fraud in a manner that was maliciously intended to damage Plaintiffs will clarify and resolve various matters that need to be addressed so that the technology and the patent rights can be fairly and reliably appraised by companies that need to decide whether they should license and use the technology.

Wherefore, the Plaintiffs, Alan Richards and GTL Technologies, Inc., request the Court to issue:

(i) a declaratory judgment declaring the Sen '226 Patent to be invalid due to fraudulent and illegal acts by Defendants;

(ii) a permanent injunction enjoining Defendants from asserting the validity of the Sen '226 Patent; and,

such other relief as this Court may deem necessary and proper.

## COUNT II
## DECLARATORY JUDGMENT RE: RICHARDS '603 PATENT

71. Paragraphs 1 - 67 are realleged and incorporated herein in their entirety.

72. Defendants' written statements have asserted that at least one additional inventor employed by Penn State must be added as a coinventor of the Richards '603 Patent, for that patent to be valid.

73. By means of false, deceptive, and defamatory statements and other illegal actions, Defendants have sought to make it impossible for Plaintiffs to license the Richards '603 patent, unless Plaintiffs give to Defendants large financial rewards that Defendants have not earned and do not deserve.

Wherefore, the Plaintiffs, Alan Richards and GTL Technologies, Inc., request the Court to issue:

(i) a declaratory judgment declaring that Ayusman Sen and/or Minren Lin are not co-inventors of the Richards '603 Patent;

(ii) a permanent injunction prohibiting Defendants from interfering with licensing of the Richards '603 patent by Plaintiffs; and,

such other relief as this Court may deem necessary and proper.

## COUNT III
## DEFAMATION, SLANDER OF TITLE, AND INJURIOUS FALSEHOOD

74. Paragraphs 1 - 67 are realleged and incorporated herein in their entirety.

75. Defendants' statements and declarations have caused Plaintiffs monetary losses.

76. Defendants' falsehoods have influenced the conduct of third parties in the oil, gas, and petrochemical industries, causing them to refrain from licensing technology which they otherwise would use, thereby reducing the market value of the Richards '603 patent and other patent rights that belong to Plaintiff Richards.

77. Defendants' wrongful conduct has directly caused Plaintiffs to incur losses from the sale of rights to use the '603 Patent, and have imposed costs and expenses (including attorneys' fees and costs) on Plaintiffs, who must work to correct the misimpressions created by the Defendants' injurious falsehoods. The financial losses caused by Defendants' damage to Plaintiff's lawful rights to license or sell the Richards '603 patent are continuing, and will continue into the future.

78. Defendants inflicted wrongful acts against Plaintiffs, with malicious intent and without any justification, in an attempt to extract unearned and undeserved financial advantages and benefits from Plaintiffs.

Wherefore, the Plaintiffs, Alan Richards and GTL Technologies, Inc., demand judgment against Defendants Ayusman Sen, Pennsylvania State University, Penn State Research Foundation, and McQuaide Blasko et al., for damages resulting from the injurious falsehoods (including attorneys' fees and costs), and punitive damages for such other relief as this Court may deem necessary and proper.

## COUNT IV
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

79. Paragraphs 1 - 67 are realleged and incorporated herein in their entirety.

80. Defendants intentionally and without justification have interfered severely with Plaintiffs' past, ongoing, and prospective business relationships with various oil, gas, and petrochemical companies.

81. Plaintiffs have suffered severe financial damages, as a result of Defendants' interference with Plaintiffs' business relationships.

Wherefore, Plaintiffs Alan Richards and GTL Technologies demand judgment against Defendants Ayusman Sen, Pennsylvania State University, Penn State Research Foundation, and McQuaide Blasko et al., for damages resulting from Defendants' tortious interference with business relationships, and for such other relief as this Court may deem necessary and proper.

## COUNT V
## BREACH OF CONTRACT

82. Plaintiffs reallege paragraphs 1 - 67 and incorporate them herein in their entirety.

83. Defendants created, signed, and agreed and committed to abide by the terms of the "STTR Contract," signed by Penn State University and by GTL Technologies. Under the terms of that STTR Contract, Defendants agreed and committed to not publicly disclose, and to not otherwise use or commercially exploit, any confidential information that they received from the Plaintiffs, except under certain limited circumstances. In reliance on that signed contract and believing they were protected by it, Plaintiffs paid Defendants $48,000.00, to pay for research assistance by Defendants, as set forth in those two contracts.

84. In knowing and deliberate violation of the STTR Contract, Defendants misappropriated the results, data, and benefits of the research that was paid for by Plaintiffs, for Defendants own use and benefit, to the detriment of Plaintiffs. As part of such actions,

21

Defendants secretly took unlawful steps to obtain a US patent, which they knew would be directly hostile to the interests of the Plaintiffs, by using and exploiting confidential information that was directly covered and protected by both of the two contracts that Defendants had created and signed with Plaintiff GTL Technologies.

85. In addition, Defendants' refusal to complete the research work they were paid to do, under the STTR contract, forced Plaintiffs to lose a reimbursement payment from the federal Department of Energy, in an amount that exceeded $99,000.00.

86. Defendants' misappropriation of the confidential information, in violation of the STTR Contract, has caused Plaintiffs direct and indirect financial losses, including the expenses, burdens, distractions and diversions they must endure to invalidate and overcome the Sen '226 patent, which was obtained on false pretenses by improper use of information that was required to remain confidential under the terms of the STTR Contract.

Wherefore, the Plaintiffs, Alan Richards and GTL Technologies, demand judgment against Defendants, Ayusman Sen, Penn State University, Penn State Research Foundation, and McQuaide Blasko et al., for damages and for attorneys' fees and costs resulting from the breach of the STTR Contract, and for such other relief as this Court may deem necessary and proper.

## COUNT VI
## UNFAIR COMPETITION

87. Plaintiffs reallege paragraphs 1 - 67 and incorporate them herein in their entirety.

88. Defendants have publicly claimed that they are the discoverers, creators, and owners of a valuable patent (the Sen '226 patent) that can be licensed by oil, gas, and petrochemical services. For the purposes of licensing and other business activities, the rights, authority, and entitlements which that patent purports to represent, embody, and protect can be classified and referred to as either "goods" or "services".

89. The Defendants have used words, terms, names, and combinations thereof, which falsely depict and misrepresent the origin, inventorship, ownership, authenticity, and legality of the goods and/or services represented by the Sen '226 patent, in ways that are deliberately intended to deceive, and cause confusion among, the oil, gas, and petrochemical companies that are potential licensees of such patent rights.

90. Such actions by Defendants directly violate 15 U.S.C. 1125(a).

Wherefore, the Plaintiffs, Alan Richards and GTL Technologies, demand judgment against Defendants, Ayusman Sen, Penn State University, Penn State Research Foundation, and McQuaide Blasko et al., for damages and for attorneys' fees and costs resulting from Defendants deceptive and unlawful acts of unfair competition as set forth in 15 U.S.C. 1125(a), and for such other relief as this Court may deem necessary and proper.

## COUNT VI
## ANTITRUST VIOLATIONS

91. Plaintiffs reallege paragraphs 1 - 67 and incorporate them herein in their entirety.

92. As stated by the U.S. Supreme Court in *Walker, Inc. v. Food Machinery*, 382 U.S. 172 (1965), since patents by their very nature create a government-approved monopoly, if acts of fraud or other illegality are used to improperly create and obtain an unlawful monopoly via a fraudulent and unlawful patent, such acts can indeed violate the antitrust laws of the U.S.

93. By acts of fraud and illegality, which did indeed create an unlawful and improper monopoly via a fraudulent patent, Defendants violated the antitrust laws of the U.S.

94. As provided by the Clayton Act, 15 U.S.C. 15, one of the principle deterrent and enforcement mechanisms, to help prevent companies and other entities from using fraud or other

illegal means to obtain improper and unlawful patents, was created when Congress authorized private parties to seek and obtain treble damages for such violations, via litigation.

DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury on all issues so triable.

Wherefore, the Plaintiffs, Alan Richards and GTL Technologies, demand a treble damage award, against Defendants Ayusman Sen, Penn State University, Penn State Research Foundation, and McQuaide Blasko et al., resulting from Defendants' use of fraud and other illegal acts to obtain an unlawful monopoly in restraint of interstate commerce, and for such other relief as this Court may deem necessary and proper.

Dated this _____ day of May, 2008.

Respectfully submitted,

By:_____

Jeffrey H. Garland
Fla. Bar No. 320765
102 N 2nd Street
Fort Pierce, FL 34950
Telephone (772) 489-2200
Fax (772) 489-0610
Jeffgar3@aol.com
Attorney for Plaintiffs

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

Alan Richards and GTL Technologies, Inc.

**08 - 14165**

**DEFENDANTS**

Aysmsmser, Pennsylvania State University, Penn State Research Foundation, and McQuaide Blasko Fleming & Faulkner, Inc.

**(b)** County of Residence of First Listed Plaintiff  Martin

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Jeffrey H. Garland, Esq.
102 N 2nd Street
Fort Pierce, FL 34950
(772) 489-2200

08 CV 14165 MA

FILED by ____ D.C.

Attorneys (If Known)

Lawrence Genova, Esq., 100 SE 2nd St., Ste. 1600, Miami, FL 33131

MAY - 9 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. PIERCE

**(d)** Check County Where Action Arose:  ☐ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☑ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) |
|---|---|

(For Diversity Cases Only)

| | | | PTF | DEF | | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☑ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | | ☑ 4 | ☐ 4 |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2 | ☑ 2 | Incorporated and Principal Place of Business In Another State | | ☐ 5 | ☑ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☑ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☑ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☑ YES ☐ NO    b) Related Cases ☐ YES ☐ NO

JUDGE Michael Moore

DOCKET NUMBER 07-14254-CIV-MOORE

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

35 U.S.C. 115. This is a patent case asking for declaratory judgment.

LENGTH OF TRIAL via 10 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE 5/9/08

FOR OFFICE USE ONLY

AMOUNT 350.00    RECEIPT # 235013    IFP